UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| RODERICK LEON SCOTT,<br><br>                    Movant,<br><br>        vs.<br><br>UNITED STATES OF AMERICA,<br><br>                    Respondent. | 4:20-CV-04181-KES<br><br><br>REPORT AND RECOMMENDATION |

**INTRODUCTION**

This matter is before the court on the *pro se* motion pursuant to 28 U.S.C. § 2255 of Roderick Leon Scott, a federal inmate.  See Docket No. 1.  Now pending is a motion to dismiss by the respondent, the United States of America ("government").  See Docket No. 20.  Mr. Scott resists the motion.  See Docket No. 22.  This matter has been referred to this magistrate judge for a recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and the October 16, 2014, standing order of the Honorable Karen E. Schreier, district judge.

**FACTS**

**A.    The 2005 Case and the 2018 Indictment**

In 2005, Mr. Scott was indicted in this court for conspiracy to distribute 50 grams or more of cocaine base.  See United States v. Scott, 4:05-cr-40077-

KES-1, Docket No. 1 (D.S.D. Jul. 20, 2005).[1] Mr. Scott was convicted by guilty plea and sentenced to 240 months' imprisonment. CR I Docket Nos. 48, 76.

Mr. Scott's supervision was revoked for violation behavior involving the use or distribution of drugs, and he was given a 36-month sentence upon revocation. CR I Docket No. 113. On September 28, 2018, Mr. Scott began a second term of supervised release on his 2005 conviction. CR I Docket No. 116.

Three months later, Mr. Scott was indicted in this court on December 4, 2018, along with co-defendant Curtis Webb. See United States v. Scott, 4:18-cr-40151-KES-2, Docket No. 1 (D.S.D. Dec. 4, 2018).[2] Two days later, a petition to revoke his supervised release was filed in his 2005 conviction case. CR I Docket No. 116.

The new 2018 indictment charged in its entirety as follows:

Beginning on an unknown date and continuing until on or about the date of this Indictment, in the District of South Dakota and elsewhere, Curtis Samuel Webb, a/k/a Corey Shawn Smith, and Roderick Leon Scott did knowingly and intentionally combine, conspire, confederate, and agree together with others known and unknown to the Grand Jury, to knowingly and intentionally distribute a mixture and substance containing 500 grams or more of methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846.

See CR II Docket No. 1.

---

[1] The court refers to documents from Mr. Scott's 2005 criminal case with the prefix "CR I."

[2] The court refers to documents from Mr. Scott's 2018 criminal case with the prefix "CR II."

Mr. Scott made his initial appearance on the indictment and on the petition to revoke supervision in this court on December 18, 2018, and this court appointed attorney Jason Tupman to represent him. CR I Docket No. 121; CR II Docket No. 21. Mr. Scott was detained at this time. CR I Docket No. 122; CR II Docket No. 23. On August 29, 2019, a plea agreement was filed along with a plea agreement supplement and a statement of factual basis. CR II Docket Nos. 57-59.

**B.    The Plea Agreement**

The plea agreement recited that Mr. Scott would plead guilty to the indictment. CR II Docket No. 57 at p. 2, ¶ C. The agreement recited the mandatory minimum sentence for the crime to which Mr. Scott would plead guilty was 10 years' imprisonment and the maximum sentence was life imprisonment. Id. In return for Mr. Scott's plea, the government agreed to recommend a three-level decrease in his base offense level under the United States Sentencing Guidelines ("USSG") for acceptance of responsibility. Id. at pp. 3-4, ¶¶ E, F. The plea agreement allowed both parties to argue for and present evidence in support of any sentence within statutory limits that each believed to be appropriate. Id. at p. 4, ¶ G. The plea agreement contained a waiver of Mr. Scott's right to appeal his sentence or conviction except in the case of an upward variance or upward departure by the district court at sentencing. Id. at p. 6, ¶ N.

Along with the plea agreement, a written statement of facts in support of the plea was filed.  CR II Docket No. 58.  That statement recited the following facts:

> Beginning on an unknown date and continuing until on or about December 4, 2018, I, along with at least one other person, reached an agreement or came to an understanding to distribute 500 grams **or more** of a mixture or substance containing methamphetamine in the District of South Dakota.
>
> I voluntarily and intentionally joined in the agreement or understanding to distribute methamphetamine.
>
> At the time I joined in the agreement or understanding to distribute methamphetamine, I knew the purpose of the agreement or understanding.
>
> While I was actively involved in furthering the purpose of the agreement or understanding, I could foresee that the quantity of methamphetamine involved in the agreement or understanding **exceeded 500 grams** of methamphetamine.
>
> During my involvement in the conspiracy, I received **several pounds** of methamphetamine from co-conspirators in the District of South Dakota and elsewhere.  Based on conversations we had, my co-conspirators were aware that I intended to sell the methamphetamine they sold and fronted to me to my own drug customers.
>
> I intended to distribute the methamphetamine in South Dakota.  I was also aware that some of my customers were distributing the methamphetamine I provided to them to their own customers.
>
> ***The parties submit that the foregoing statement of facts is not intended to be a complete description of the offense or the Defendant's involvement in it.  Instead, the statement is offered for the limited purpose of satisfying the requirements of Fed. R. Crim. P. 11(b)(3).  The parties understand that additional information relevant to sentencing, including additional drug quantities, may be developed and attributed to the Defendant for sentencing purposes.***

See id. (emphasis added).

4

The final plea agreement document was a plea agreement supplement. CR II Docket No. 59.

**C.    The Change of Plea Hearing**

Mr. Scott appeared before the court on September 5, 2019, and was placed under oath.  CR II Docket No. 95 at pp. 1-2.  Therefore, all the answers he gave were given under penalty of perjury.  Id. at p. 2.

Mr. Scott testified he was 43, had his general equivalency diploma, and was not under the influence of any drug, medication, alcohol, or mental illness. Id. at p. 3.  He stated he was fully satisfied with his counsel's advice and representation.  Id.

Mr. Scott stated he had entered into a plea agreement and plea agreement supplement with the government and had read and discussed those documents with counsel.  Id. at p. 4.  He testified he understood those agreements.  Id.  He denied that anyone had threatened or tried to persuade him to accept the agreements.  Id. at pp. 4-5.  Further, he stated the written agreements contained the entirety of the parties' agreements—there were no promises made that were not written down in the agreements.  Id. at p. 4. Mr. Scott stated he was pleading guilty of his own free will because he was guilty.  Id. at p. 5.  Mr. Scott stated he understood the court might impose a sentence that was more severe than he anticipated.  Id. at pp. 4-5.   The court explained that Mr. Scott would be subject to a minimum sentence of 10 years' imprisonment and a maximum possible sentence of life imprisonment.  Id. at pp. 5-6.  Mr. Scott testified he understood this.  Id. at p. 6.

The court asked if Mr. Scott had discussed his USSG range with counsel. Id. Mr. Scott replied he had. Id. The court explained it could not predict what Mr. Scott's USSG range might be at sentencing because the presentence investigation report ("PSR") had to be written first and then the court would rule on any objections to the PSR. Id. The court explained that, because of the uncertainty, Mr. Scott's actual USSG range might be different than what he and counsel had discussed. Id. at pp. 6-7. Mr. Scott testified he understood this. Id. at p. 7. The court also explained that once Mr. Scott's USSG range was determined, the court would then determine if there were reasons to give him a higher or lower sentence than the advisory USSG range. Id. Mr. Scott stated he understood this. Id.

The court explained that, in his plea agreement, Mr. Scott was giving up the right to appeal everything about his case except jurisdiction and upward departure or variance. Id. Mr. Scott stated he understood this. Id. at p. 8.

The court then explained Mr. Scott had a right to plead not guilty to the indictment and to avail himself of his right to a trial by jury. Id. During the trial, the court explained it would tell the jury Mr. Scott was presumed innocent and the burden was on the government to prove his guilt beyond a reasonable doubt. Id.

The court explained Mr. Scott would have the assistance of a lawyer at trial and at every other stage of the proceedings and that lawyer would be appointed free of charge to Mr. Scott, if necessary. Id. The court told Mr. Scott

he would have the right to see and hear all the witnesses at trial and have them cross-examined by his lawyer.  Id.

The court told Mr. Scott he would have the right not to testify at trial unless he voluntarily gave up that right.  Id.  He would also have the right to subpoena witnesses to testify.  Id.  If Mr. Scott elected not to testify, the court said it would tell the jury it could not use that fact against him.  Id.  The court also explained if Mr. Scott entered a plea of guilty, there would not be a trial and he would be giving up all the other rights the court just described.  Id. at p. 9.  Mr. Scott testified under oath he understood all this.  Id.

The court explained the essential elements of the crime of conspiracy to distribute a controlled substance which the government would be required to prove beyond a reasonable doubt at trial.  Id.  This included proving that the conspiracy distributed "500 grams *or more* of methamphetamine."  Id. (emphasis added).  Mr. Scott stated he understood what he was charged with and what the government would have to prove at a trial.  Id.

The court asked Mr. Scott whether he had read the factual basis statement before signing it.  Id. at pp. 9-10.  He stated he had.  Id. at p. 10. The court asked whether everything in the statement was the truth.  Id. Mr. Scott stated it was.  Id.

Mr. Scott then entered a plea of guilty to the indictment.  Id. at p. 11. Afterward, the court found:

> [T]hat the defendant is fully competent and capable of entering an informed plea.  That he is aware of the nature of the charges and the consequences of the plea, and that the plea of gulty is a knowing and voluntary plea supported by an independent basis in

7

fact containing each of the essential elements of the offense.  The plea is, therefore, accepted, and the defendant is now adjudged guilty of that offense.

Id.

## D.    The PSR and Objections

### 1.    Draft PSR

On October 16, 2019, a draft PSR was issued.  CR II Docket No. 78.  The PSR attributed 19.73 kilograms of methamphetamine to Mr. Scott.  Id. at p. 6, ¶ 16.  Based on that amount of meth, the draft PSR calculated Mr. Scott's USSG range as follows:

| | |
|---|---|
| Base Offense Level Based on Drug Quantity | 36 |
| or | |
| Career Offender Enhancement Base Offense Level | 37 |
| Acceptance of Responsibility | -3 |
| Total Offense Level | 34 |

Id. at pp. 7-8, ¶¶ 22-31.

The draft PSR placed Mr. Scott in criminal history category VI based on a calculation of 11 criminal history points and his career offender status.  Id. at p. 15, ¶ 51.  With a criminal history category of VI and a base offense level of 34, the draft PSR calculated Mr. Scott's USSG range to be 262 to 327 months' imprisonment with a minimum statutory sentence of 120 months.  Id. at p. 24, ¶¶ 98-99.

### 2.    Objections to the Draft PSR

Counsel for Mr. Scott filed objections to the draft PSR on November 4, 2019.  CR II Docket No. 79.  Counsel objected to the draft PSR's calculation of drug quantity, noting that some of the drugs attributed to Mr. Scott in the report were exchanged during a time period when Mr. Scott was incarcerated. Id. at p. 1 (noting Mr. Scott was not released from BOP custody until September 28, 2018, but the draft PSR attributed drug quantities to him from the summer through September).

Counsel also objected to Mr. Scott's classification as a career offender. Id. at p. 2.  Counsel argued that neither the instant offense nor Mr. Scott's prior federal drug felony constituted a "controlled substance offense" under the USSG.  Id.  Specifically, counsel argued that federal statutory drug conspiracy under 21 U.S.C. § 846 was outside the definition of "controlled substance offense" under the USSG because a "controlled substance offense" requires an overt act, while a violation of § 846 does not require an overt act.  Id.   Counsel also pointed out that USSG § 4B1.2(b) does not list inchoate offenses like conspiracy in the text of the provision.  Id.  Without counting his two federal felonies, counsel argued that Mr. Scott did not have the requisite prior convictions to qualify as a career offender.  Id. at p. 3.

### 3.    Final PSR

In response to counsel's objections to the draft PSR, the PSR was partially revised and filed November 11, 2019.  CR II Docket No. 81. Specifically, the drug quantity calculation was revised to place Mr. Scott's base

offense level at a 34 instead of a 36; some drug quantities were subtracted due to the fact those quantities were exchanged while Mr. Scott was incarcerated. Id.

As to the objection to the career offender enhancement, the PSR author rejected that argument, noting that in both his 2005 case and his 2018 drug case Mr. Scott did not plead guilty solely to conspiracy under § 846, but also to a violation of 21 U.S.C. § 841(a)(1) which required actual distribution (an overt act). Id. In addition, in both cases, Mr. Scott admitted in his plea agreement to actual distribution of controlled substances. Id. Therefore, the PSR author concluded counsel's "no overt act" argument had no application to the facts of Mr. Scott's case. Id.

In the final PSR, the drug quantity attributed to Mr. Scott was reduced to 8.84 kilograms based on the period from September 28, 2018, to October 24, 2018. CR II Docket No. 80 at p. 6, ¶ 16. His criminal history category remained at VI. Mr. Scott's USSG calculation was as follows:

| | |
|---|---|
| Base Offense Level Based on Drug Quantity | 34 |
| or | |
| Career Offender Enhancement Base Offense Level | 37 |
| Acceptance of Responsibility | -3 |
| Total Offense Level | 34 |

Id. at pp. 7-8, ¶¶ 22-31. Mr. Scott's USSG range remained 262 to 327 months' imprisonment with a minimum term of imprisonment of 120 months. Id. at p. 24, ¶¶ 99-100.

**E.    The Sentencing**

**1.    Motion for Downward Variance**

Prior to sentencing on November 13, 2019, counsel filed a motion for a downward variance on Mr. Scott's behalf.  CR II Docket No. 84.  Counsel noted that Mr. Scott's USSG range was premised on his classification as a career offender.  Id. at p. 1.  Counsel argued that the career offender guideline failed to meaningfully distinguish among career offenders with different types of criminal records and resulted in an overly severe sentence in Mr. Scott's case.  Id.

Counsel noted that the United States Sentencing Commission had proposed changes to the federal statute which, if adopted by Congress, would result in Mr. Scott *not* being classified as a career offender.  Id. at p. 4. Counsel pointed out that the USSG are not binding on the court and urged the court to impose a lesser sentence because the USSG sentence was greater than necessary.  Id. at p. 5.  Counsel noted that without the career offender enhancement, Mr. Scott would have a USSG range of 168-210 months, similar to the 210-month sentence his co-defendant Mr. Webb received.  Id. at p. 6; See also United States v. Webb, 4:18-cr-40151-KES-1, Docket No. 73 (D.S.D. Sept. 9, 2019).[3]  Counsel asked the court to impose a similar sentence in Mr. Scott's case.  CR II Docket No. 84 at p. 6.

---

[3] The court refers to documents from Mr. Webb's criminal case with the prefix "Webb CR."

### 2.    Mr. Scott's Written Allocution Statement

Mr. Scott wrote an allocution statement to the court filed November 13, 2019.  CR II Docket No. 83.  In it, he expressed remorse and guilt for his actions.  Id.  He stated he wanted to learn a trade while in prison so that he could help people.  Id.  He expressed sorrow for the harm his actions did to his family and those who loved him.  Id.

### 3.    Sentencing Hearing

Mr. Scott was sentenced on November 26, 2019, for both his plea of guilty to the indictment as well as for his supervised release violation in his 2005 case.  CR II Docket No. 97.  The court first turned to counsel's one remaining objection to the PSR—the objection to the career offender enhancement.  Id. at p. 3.  The court overruled the objection.  Id.  The court noted Mr. Scott did not plead guilty to generic conspiracy, but rather to an attempt to distribute a controlled substance as part of a conspiracy.  Id. at p. 4.  After overruling the objection, the court announced Mr. Scott's USSG advisory range was 262 to 327 months' custody.  Id.

Next, Mr. Scott made an admission to allegation number three in his petition to revoke supervised release.  Id. at p. 5.  The government supplied the factual basis for the admission.  Id. at p. 6.  The court announced the USSG advisory sentencing range for the supervised release violation was 46 to 57 months' imprisonment.  Id.

Counsel argued for a downward variance for Mr. Scott, emphasizing his difficult life circumstances, the proposed changes to the career offender

12

enhancement pending before Congress, and the sentence that co-defendant Curtis Webb received, who was also a career offender with the same criminal history as Mr. Scott. Id. at pp. 6-9. Counsel specifically asked for a sentence of 200 months' imprisonment. Id.

The court noted Mr. Webb was sentenced to 210 months' imprisonment. Id. at p. 13. However, the court noted Mr. Webb's situation was distinguished from Mr. Scott's case because Mr. Webb was *not* on supervised release at the time he committed the instant crime while Mr. Scott *was* on supervised release. Id. The court told Mr. Scott the fact he committed the instant crime so close in time to when he finished his prison sentence in the 2005 case showed that he had not learned anything from his time in custody. Id. He was not interested in changing the pattern of his life. Id. The court expressed the opinion that there was an extremely high likelihood Mr. Scott would reoffend again if released. Id. at p. 14. The court also said Mr. Scott's career offender classification accurately reflected his record based on his prior drug convictions and the fact he committed the instant crime while on supervised release. Id.

The court refused to downward vary or depart, but stated it would sentence Mr. Scott at the very bottom of his USSG range. Id. The court also rejected the government's request for the two sentences to run consecutive and instead announced the two sentences would run concurrent to one another. Id. The court sentenced Mr. Scott to 262 months' imprisonment on the indictment and 46 months on the petition to revoke, for an effective sentence of

262 months.  Id. at pp. 15, 18.  The court advised Mr. Scott that, although he had waived his right to appeal in his plea agreement, if he believed he had an issue that was preserved for appeal, he must file his notice of appeal within 14 days.  Id. at p. 17.  Mr. Scott did not file a direct appeal of his conviction or sentence.

**F.    Claims Raised in Mr. Scott's § 2255 Motion**

Mr. Scott timely filed the instant motion to vacate, set aside, or correct his sentence.  Docket No. 1.  Mr. Scott raises the following claims for habeas relief in his § 2255 motion:

1.    His Fourth Amendment rights were violated by the traffic stop being unreasonably prolonged.

2.    His Sixth Amendment right to effective assistance of counsel was violated in the following ways:

a.    counsel failed to show an adversarial stance in arguing against the career offender enhancement

b.    counsel failed to object to the use of a prior conviction to enhance his sentence where the prior convition resulted in only a sentence of probation

c.    counsel failed to object to the miscalculation of his drug quantity

d.    counsel failed to assert that Mr. Scott's sentence was disproportionate to the sentence of a co-defendant, Curtis Webb, who was on probation for a previous methamphetamine conviction at the time he was arrested on this case with Mr. Scott and Mr. Scott was a subordinate to Mr. Webb in the conspiracy

e.    counsel failed to move to suppress the evidence from the traffic stop

f.    counsel failed to challenge the indictment as defective

3.      Mr. Scott's Fifth and Sixth Amendment rights were violated when the court found facts as to drug quantity without a jury where that drug quantity finding increased Mr. Scott's sentence

4.      The indictment was a legal nullity and Mr. Scott's conviction thereon must be vacated because the indictment is missing an essential element of the crime.

5.      The sentence imposed created a disparity.

See Docket No. 1 at pp. 3-30.  The government now moves to dismiss Mr. Scott's § 2255 motion without holding an evidentiary hearing.  See Docket No. 20.  Mr. Scott resists.  See Docket No. 22.

**DISCUSSION**

**A.      Scope of a § 2255 Motion**

Section 2255 of Title 28 of the United States Code was enacted to supersede habeas corpus practice for federal prisoners.  Davis v. United States, 417 U.S. 333, 343-44 (1974).  Section "2255 was intended to afford federal prisoners a remedy identical in scope to federal habeas corpus."  Id. at 343.  Prior to the enactment of § 2255, habeas claims had to be brought in the district where the prisoner was confined, resulting in overburdening those districts where federal correctional institutions were located and presenting logistical issues because the record in the underlying criminal case was often in a distant location.  United States v. Hayman, 342 U.S. 205, 212-16 (1952).  The enactment of § 2255 resolved these issues by requiring that the motion be filed in the sentencing court.  Id.

The scope of a § 2255 motion is seemingly broader than the scope of a habeas petition, the latter of which is typically limited to allegations of a

15

constitutional dimension.  Section 2255 allows a federal prisoner to "vacate, set aside or correct" a federal sentence on the ground that "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."  See 28 U.S.C. § 2255(a).  Where the allegation for relief is *not* based on a violation of a Constitutional or federal statutory right or an assertion that the court was without jurisdiction, the Supreme Court has read a "fundamentality" requirement into § 2255—relief is available for only those errors which constitute a "fundamental defect which inherently results in a complete miscarriage of justice" or "an omission inconsistent with the rudimentary demands of fair procedure."  Hill v. United States, 368 U.S. 424, 428 (1962); see Peguero v. United States, 526 U.S. 23, 27-30 (1999).

Generally, petitioners are precluded from asserting claims pursuant to § 2255 that they failed to raise on direct appeal.  United States v. Frady, 456 U.S. 152, 167-68 (1982); McNeal v. United States, 249 F.3d 747, 749 (8th Cir. 2001).  When a § 2255 petitioner asserts a claim that is procedurally defaulted because it was not raised on direct appeal, the claim can only proceed after the petitioner has shown either:  (1) actual innocence or (2) that the procedural default should be excused because there was both cause for the default and actual prejudice to the petitioner.  Bousley v. United States, 523 U.S. 614, 621-22 (1998); McNeal, 249 F.3d at 749.  Therefore, barring a claim of actual innocence, a petitioner must show both cause for why he failed to raise an

16

issue on direct appeal as well as actual prejudice caused by the alleged errors. If a movant fails to demonstrate prejudice, the court need not address whether cause exists to excuse a procedural default.  <u>Moore-El v. Luebbers</u>, 446 F.3d 890, 898 (8th Cir. 2006).

Appellate courts generally refuse to review claims of ineffective assistance of counsel on direct appeal; such claims are, therefore, properly addressed in a 28 U.S.C. § 2255 motion such as the one here.  <u>See</u> <u>United States v. Campbell</u>, 764 F.3d 880, 892-93 (8th Cir. 2014); <u>United States v. Lee</u>, 374 F.3d 637, 654 (8th Cir. 2004) (ineffective assistance of counsel claims are not generally cognizable on direct appeal and will be heard only to prevent a miscarriage of justice or in cases where the district court has developed a record on the issue).  Therefore, no procedural default analysis is required before examining petitioner's claims of constitutionally deficient counsel.

## B.    Mr. Scott's Pre-Plea Claims

Mr. Scott has two claims that do not fall under the umbrella of ineffective assistance of counsel and which concern matters that could have been addressed prior to his plea.  Those claims are his Fourth Amendment claim related to his traffic stop and the alleged defectiveness of the indictment.  The court notes that Mr. Scott at no time alleges his plea of guilty suffers from any constitutional infirmities.  The court concludes these two claims are precluded by Mr. Scott's knowing, intelligent and voluntary plea.

When a § 2255 petitioner has been convicted in his direct criminal proceedings by entering a guilty plea, the scope of issues available to him to be raised in habeas proceedings is curtailed.  As the Supreme Court has stated:

> [A] guilty plea represents a break in the chain of events which has preceded it in the criminal process.  When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea.  He may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within the standards set forth in [McMann v. Richardson, 397 U.S. 759 (1970)].
>
> A guilty plea, voluntarily and intelligently entered, may not be vacated because the defendant was not advised of every conceivable constitutional [issue] he might have to the charge, no matter how peripheral such a plea might be to the normal focus of counsel's inquiry.  And just as it is not sufficient for the criminal defendant seeking to set aside such a plea to show that his counsel in retrospect may not have correctly appraised the constitutional significance of certain historical facts, . . ., it is likewise not sufficient that he show that if counsel had pursued a certain factual inquiry such a pursuit would have uncovered a possible constitutional infirmity in the proceedings.

Tollett v. Henderson, 411 U.S. 258, 267 (1973).

The Supreme Court has explained why a guilty plea cuts off all constitutional claims that predate a plea.  Pleas are necessarily based on imperfect knowledge of the law and facts—one can only know what the result of a full-blown jury trial will be after the trial has been had, and, even then, truth is still often in dispute.  McMann, 397 U.S. 769-70.  If a defendant admits his commission of a crime, upon good-faith, reasonably competent advice from his counsel, the defendant assumes the risk that his attorney might be wrong about the facts or the outcome of a legal issue.  Id. at 774.

18

The issue presented in habeas proceedings is not whether—in retrospect--counsel was right or wrong about a certain fact or legal analysis, but rather, whether the defendant's plea was made voluntarily and intelligently and upon advice from his attorney that was "within the range of competence demanded of attorneys in criminal cases." Id. at 770-71. Therefore, a defendant who pleaded guilty because of a prior coerced confession that he believed would be used against him at trial is not entitled to an evidentiary hearing in a habeas proceeding without showing other, extenuating circumstances. Id. at 771.

A voluntary and knowing plea is not transformed into a coerced plea simply because the defendant pleaded guilty to obtain a lesser sentence than the maximum possible penalty that would have been applicable if defendant had been convicted at trial. Brady v. United States, 397 U.S. 742, 751 (1970); Parker v. North Carolina, 397 U.S. 790, 795 (1970). Guilty pleas are valid if the court record affirmatively discloses the plea was both voluntary and intelligent. Boykin v. Alabama, 395 U.S. 238, 242 (1969).

A plea is voluntary if it is made by a defendant who is "fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel," and so long as the plea was not induced by threats, misrepresentation, or by promises that are improper, unfulfilled, or unfulfillable. Brady, 397 U.S. at 755.

A plea is intelligently made if the defendant was aware of the nature of the charge against him, and he was mentally competent and in control of his

19

mental faculties.  Brady, 397 U.S. at 756.  A plea is not rendered unintelligently made simply because, long after the plea was entered, the defendant realizes his cost-benefit analysis as to whether to go to trial or to plead guilty did not correctly take into account every relevant factor which entered into his decision.  Id. at 756-57.

Here, Mr. Scott's plea was constitutional.  He knew the nature of the charges against him, the mandatory minimum and maximum penalties, and the fact that his USSG range might be higher than anticipated.  The record establishes he was mentally competent, not under the influence of any drug or alcohol, and knowlegeable about his rights and the fact he would be giving up those rights if he pleaded guilty.  He had no complaints about his lawyer's representation of him or the advice counsel had given him.  The court made abundantly clear that, if Mr. Scott entered a guilty plea, he would be giving up the right to contest his guilt as well as every other issue in his case except the court's jurisdiction and an upward variance or departure.

The Fourth Amendment violation Mr. Scott wishes to raise here stems from the traffic stop in his case.  He alleges the police unlawfully extended the duration of the stop, thus violating Mr. Scott's constitutional rights.  This is an issue that could have been raised pre-plea and that is now barred by Mr. Scott's constitutional plea of guilty.

Likewise, the claim that the indictment was defective (Mr. Scott does not identify a constitutional right he believes to have been violated here), is a claim that could have been raised before his plea.  At his plea hearing, the court

20

explained the essential elements the government would have to prove at trial in order to convict Mr. Scott.  Any claim that the indictment failed to set forth the elements of the crime is a claim that was precluded the moment Mr. Scott entered his guilty plea.

Because both claims described above are precluded by the entry of a valid plea of guilty by Mr. Scott, the court recommends the government's motion to dismiss those claims with prejudice be granted.

## C.    Mr. Scott's Claim Regarding the Court's Error as to Drug Quantity

Mr. Scott alleges the district court violated his rights under the Fifth and Sixth Amendments by finding facts (drug quantities) which served to increase his sentence instead of submitting those matters to a jury to determine.  As stated above, this claim is procedurally defaulted because it was not raised in a direct appeal.  Frady, 456 U.S. at 167-68; McNeal, 249 F.3d at 749.  It is noteworthy that Mr. Scott never alleges he told his trial counsel to file an appeal.  Because this claim is defaulted, the court considers whether there is cause to excuse the default and prejudice.[4]  Bousley, 523 U.S. at 621-22; McNeal, 249 F.3d at 749.

Mr. Scott alleges counsel was constitutionally ineffective for failing to raise this issue and, thus, that he has established cause which should excuse his procedural default.  Docket No. 1 at p. 17.  Mr. Scott does not address the prejudice prong of the inquiry.  Id.

---

[4] Mr. Scott does not assert that he is actually innocent, in fact admitting that he broke the law and must serve some type of prison sentence.  Docket No. 1 at p. 27.  Therefore, the court does not discuss the actual innocence exception.

The court finds Mr. Scott has not and cannot establish prejudice. The drug quantity calculation affected Mr. Scott's base offense level for the conviction for conspiracy to distribute methamphetamine. See USSG § 2D1.1. The final PSR attributed 8.84 kilograms of meth to Mr. Scott. CR II Docket No. 80 at p. 6, ¶ 16. If one is convicted of distributing at least 5 kilograms of methamphetamine but less than 15 kilograms, the base offense level for the crime is 34. USSG § 2D1.1(c)(3).

However, Mr. Scott was classified as a career offender under USSG § 4B1.1(a) because he was at least 18 years old at the time of the instant offense, his instant offense was a controlled substance offense, and he had at least two prior convictions of either a crime of violence or a controlled substance offense. See USSG § 4B1.1(a). When a defendant qualifies as a career offender, the offense level under § 4B1.1 applies instead of the otherwise applicable base offense level if the § 4B1.1 offense level is higher. See USSG § 4B1.1(b).

The base offense level under § 4B1.1 is determined by reference to the statutory maximum penalty for the offense of conviction. Id. If the offense statutory maximum is life in prison, as it was in Mr. Scott's case, the base offense level under § 4B1.1(b) is 37. Id. Here, the PSR and the court began Mr. Scott's USSG calculation with a base offense level of 37 as dictated by USSG § 4B1.1, and then reduced it to a total offense level of 34 based on a three-point adjustment for acceptance of responsibility. CR II Docket No. 80 at p. 8, ¶¶ 27-31; CR II Docket No. 97 at p. 4. Thus, the drug quantity

calculation, even if it was in error, even if it violated Mr. Scott's constitutional rights, did not prejudice him.  His USSG range was determined by the application of § 4B1.1, the career offender provision, not by § 2D1.1(c), the drug quantity provision.[5]

Where a § 2255 movant has not demonstrated prejudice, the court need not address cause.  Moore-El, 446 F.3d at 898.  Here, the court concludes Mr. Scott has failed to carry his burden of establishing he was prejudiced by any error of the court in determining the drug quantities attributed to him. Therefore, the court recommends his claim concerning that error be dismissed because it is procedurally defaulted and cause and prejudice are not established.  A dismissal based upon procedural default is a dismissal with prejudice.  Armstrong v. Iowa, 418 F.3d 924, 925, 927 (8th Cir. 2005); Ogle v. Johnson, 488 F.3d 1364, 1370 (11th Cir. 2007).

## D.    Mr. Scott's Claim Regarding Sentence Disparity

Mr. Scott asserts that his 262-month sentence is constitutionally disparate compared to the 210-month sentence imposed on his co-defendant, Curtis Webb, and another co-conspirator, Gabriel Orlando Ramirez.[6]  Mr. Scott argues that Mr. Webb's role in the conspiracy was more involved and Mr. Scott

---

[5] The court notes that while Mr. Scott emphasizes repeatedly that he only entered a guilty plea to distributing 500 grams of meth, really he pleaded guilty to distributing 500 grams *or more* of meth.  In addition, he admitted in his factual basis statement to distributing "several pounds" of meth.  CR II Docket No. 58.

[6] Mr. Scott does not recite what Mr. Ramirez's sentence in his case was.

had only been involved in "[Mr.] Webb's conspiracy" for two months (because he had been in prison prior thereto).  Docket No. 1 at p. 26.

At sentencing, the court dispensed with this argument by noting that the distinguishing feature between Mr. Scott and Mr. Webb was that Mr. Scott committed this new drug conspiracy crime while he was still on supervised release for his 2005 federal drug conviction.  Mr. Webb was not similarly situated according to the court.  Although Mr. Webb had a sufficiently severe criminal history to place him within the career offender classification, apparently the court thought he was not under supervision at the time he committed the 2018 charge.

But Mr. Scott alleges Mr. Webb, like himself, committed the instant crime while still under supervision for a prior drug felony.  Docket No. 1 at p. 10.  There appears to be some merit to this factual assertion, although Mr. Webb's prior offense for which he was under supervision was a state court conviction and Mr. Scott's was a federal court conviction.  Webb CR Docket No. 65 at p. 10, ¶ 39 (assessing two extra criminal history points because Mr. Webb committed the instant offense while on parole for a state court felony drug conviction).  Thus, there is some superficial appeal to Mr. Scott's argument that, contrary to what the court stated at his sentencing, he and Mr. Webb *were* similarly situated in that both committed the instant offense while they were still under supervision for a prior drug felony and both Mr. Scott and Mr. Webb were classified as career criminals.

The government does not address this claim in its motion.  The court notes that this claim is procedurally defaulted because Mr. Scott did not raise the claim in a direct appeal.  Therefore, in order for the court to consider the claim on the merits, it is Mr. Scott's burden to show cause and prejudice.

Mr. Scott alleges as "cause" the assertion that counsel was ineffective. Although in some instances ineffective assistance of counsel can constitute cause excusing a procedural default (see Dansby v. Hobbs, 766 F.3d 809, 834 (8th Cir. 2014)), as discussed below, the court finds factual issues remain regarding whether counsel was ineffective in connection with Mr. Scott's argument that his sentence was disparate when compared to Mr. Webb's. Counsel *did* raise this proportionality argument both in a pre-sentencing written motion and orally in argument before the court at the sentencing hearing, but it is unknown whether he made any attempts to ascertain whether Mr. Webb was on parole at the time of the instant offense.

To highlight the importance of this fact, the court recites the following exchange which occurred between the court and counsel in the midst of counsel's disparate sentence argument:

> THE COURT:  Mr. Tupman, the codefendant was not on supervised release at the time that he was engaged in the offense; was he?
>
> MR. TUPMAN:  Well, I don't have [Mr. Webb's] PSR, but certainly he had prior convictions that got him to be a career offender. I don't know if he was on probation, supervised release, what have you.  The Court would have access to that, not me.

CR II Docket No. 97 at p. 9, lines 18-25.

25

When Mr. Scott addressed the court, the court raised the issue again:

> THE COURT:  So you were on supervision when this happened, and the amount of meth that was found on you was quite a substantial amount.  Did being on supervised release have any impact on you?

Id. at p. 10, lines 6-9.

Finally, when the court was explaining its sentence, the court said the following:

> When I look at a sentence that I think is appropriate, your codefendant [Curtis Webb] received 210 months in custody.  But he wasn't on supervised release at the time that this happened.  Your other offense is so close in time, when you consider the amount of time that you spent in custody, that it really shows me that you didn't learn anything from that prior time you were in custody.  You weren't interested in changing your pattern of life.  You go from one time being in custody to another time being in custody, most of them drug offenses.  So I think your likelihood of reoffending again once you're release is extremely high that you'll get back into the drug business again.

> So because—I think this is a time when being a career offender accurately reflects what your record is, based on the number of prior drug convictions that you have and the fact that this was committed while you were on supervised release.  So I am not going to downward depart or downward vary . . . .

Id. at pp. 13-14.

As discussed in more detail below, Mr. Scott had nine felony drug convictions at the time of his sentencing, but Mr. Webb had five felony drug convictions at the time of his sentencing, four of which were drug felonies. Compare Webb CR Docket No. 65 at pp. 8-10; with CR II Docket No. 80 at pp. 10-14.  Both men, by virtue of the application of the career offender enhancement, were in criminal history category VI.  Thus, both men had many prior drug felonies and both men committed the instant offense while still

26

under supervision for a prior drug felony.  Clearly, based on what the court stated at Mr. Scott's sentencing, the fact that Mr. Scott was on supervision was an important sentencing factor to the court.  Mr. Webb's USSG range was identical to Mr. Scott's.  <u>Compare</u> CR II Docket No. 80 at p. 24, ¶ 100, <u>with</u> Webb CR Docket No. 65 at p. 17, ¶ 70 (both setting forth a USSG range of 262 to 327 months).  Both defendants entered guilty pleas with the same approximate degree of promptness (within two months of each other).

So, these two defendants appear nearly identical on paper, but in one case, Mr. Webb's, the court varied downward from the 262-month bottom-of-the-Guidelines range and in the other case, Mr. Scott's, the court refused to grant a variance.  <u>Compare</u> Webb CR Docket No. 73-1 (statement of reasons as to variance in Mr. Webb's case), <u>with</u> CR II Docket No. 87-1 (statement of reasons as to no variance in Mr. Scott's case).

Moreover, although the Eighth Circuit has refused to entertain claims of disparate sentencing when the defendant making the claim was sentenced *before* his co-defendants (<u>see</u> <u>United States v. Fry</u>, 792 F.3d 884, 891-92 (8th Cir. 2015)), here, Webb was sentenced *before* Mr. Scott, so that rationale for rejecting a disparate sentence argument does not apply in this case.[7]  At the time the court sentenced Mr. Scott, it already knew what sentence had been imposed on Mr. Webb.

_____

[7] Mr. Webb was sentenced on September 9, 2019, while Mr. Scott was sentenced on November 26, 2019.  <u>See</u> <u>Webb/Scott</u>, 4:18-cr-40151 at Docket Nos. 72 and 86.  Both men were sentenced by the same district court judge.

Mr. Scott must show not only cause for his procedural default, but also that he is raising a substantial claim. <u>Dansby</u>, 766 F.3d at 834. A substantial claim is one that "has some merit." <u>Id.</u> (citing <u>Martinez v. Ryan</u>, 566 U.S. 1, 14 (2012)).

The Eighth Amendment's prohibition on cruel and unusual punishment includes a prohibition on sentences that are disproportionate. <u>Solem v. Helm</u>, 463 U.S. 277, 284, 286 (1983). Successful proportionality challenges are "exceedingly rare" outside the context of death penalty cases. <u>Id.</u> at 289-90. Nevertheless, it is not entirely inapplicable to cases involving mere prison sentences. <u>Id.</u> at 290. In applying the proportionality analysis, courts apply three objective factors: "(i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions." <u>Id.</u> at 292. The Eighth Circuit applies a "grossly disproportionate" analysis under the Eighth Amendment. <u>United States v. Jefferson</u>, 819 F. App'x 474, 475 (8th Cir. 2020) (per curiam).

In the <u>Jefferson</u> case, the court rejected a disproportionality argument on similar facts to Mr. Scott's case. Jefferson had pleaded guilty to conspiracy to distribute 500 grams or more of methamphetamine. <u>Id.</u> He was classified as a career criminal and had a USSG range of 360 months to life imprisonment. <u>Id.</u> The district court sentenced him to 300 months' imprisonment, and Jefferson argued in his direct appeal that this sentence was constitutionally disproportionate to the crime. <u>Id.</u> The court acknowledged that Jefferson's

sentence was long, but noted it was less than the statutory maximum of life imprisonment and less than the USSG range minimum of 360 months.  Id. The court found Jefferson's case did not present "the rare case" in which the sentence ran afoul of the Eighth Amendment.  Id.  So, this court concludes Mr. Scott's sentence is not disproportionate to the crime.

The Jefferson decision involved a comparison between the sentence imposed and the crime of conviction.  Id.  Here, Mr. Scott posits a proportionality argument based on a comparison between his sentence and that of his co-defendant, which presents a different argument from that considered in Jefferson.

The courts have fairly routinely rejected claims of disproportionality based on comparisons between co-defendants.  See United States v. Johnson, 495 F.3d 951, 960-62 (8th Cir. 2007) (rejecting comparison between alleged principal's life sentence and co-defendant's death sentence) (citing McCleskey v. Kemp, 481 U.S. 279, 306-07 (1987) (rejecting proportionality argument as between co-defendants); United States v. Chauncey, 420 F.3d 864, 876 (8th Cir. 2005) (stating that a defendant's sentence is not disproportionate under the Eighth Amendment merely because it exceeds his co-defendant's sentence)).  See also United States v. Brown, 634 F.3d 435, 440 (8th Cir. 2011) (rejecting argument that sentence was disproportionate to co-defendant's); United States v. Ramos, 358 F. App'x 754, 754 (8th Cir. 2009) (per curiam) (rejecting defendant's proportionality argument based on co-defendant's lower sentence); Holloway v. United States, 960 F.2d 1348, 1352 (8th Cir. 1992)

(rejecting § 2255 petitioner's claim that his sentence was disproportionate to co-defendant's based on "bald assertion[]" that co-defendant was more culpable).

However, the Eighth Circuit has often noted distinguishing features between one co-defendant and another in rejecting claims of intra-case proportionality, thereby suggesting such comparisons are not rejected categorically. For example, the court has observed that disparate sentences are justified where one co-defendant cooperated with the government and the other did not. United States v. Garcia, 512 F.3d 1004, 1006 (8th Cir. 2008); United States v. Chauncey, 420 F.3d 864, 876 (8th Cir. 2005). Or where one co-defendant's criminal history was more serious than the other co-defendant's. Chauncey, 420 F.3d at 876. The court has rejected intra-case proportionality claims where the sentencing court found "meaningful distinctions between the two defendants' cases." United States v. Jones, 718 F. App'x 443, 447 (8th Cir. 2017).

Here, this court can discern no "meaningful distinction" between Mr. Scott and Mr. Webb. Both had lengthy criminal histories which included four or more felony drug crimes. Both committed the instant offense while under supervision for a prior drug felony. Both pleaded guilty instead of going to trial. Both fell within the career offender classification. Furthermore, the one distinction relied upon and articulated by the court appears to be in error or at least not a material distinction—Mr. Scott committed the instant crime while on federal supervision for a prior felony drug crime while Mr. Webb

30

committed the instant crime while on state supervision for a prior felony drug crime. On these facts, the court cannot conclude that Mr. Scott has failed to make out a substantial case. The court accordingly recommends denying respondent's motion to dismiss as it applies to the claim that Mr. Scott's sentence is disproportionate when compared to Mr. Webb's sentence.

## E.    Ineffective Assistance of Counsel

Mr. Scott asserts a litany of claims that his counsel was ineffective, thus allegedly violating Mr. Scott's Sixth Amendment right to effective assistance of counsel. The government argues Mr. Scott has not met his burden to show both deficient conduct by counsel and prejudice to him as a result.

### 1.    Standard for Ineffective Assistance of Counsel Claims

Unlike the above-discussed claims, claims of ineffective assistance of counsel are generally not heard on direct appeal. Campbell, 764 F.3d at 892-93; Lee, 374 F.3d at 654. Therefore, ineffective assistance claims can permissibly be raised for the first time in a § 2255 motion.

The Sixth Amendment of the Constitution of the United States affords a criminal defendant with the right to assistance of counsel. U.S. Const. amend. VI. The Supreme Court "has recognized that 'the right to counsel is the right to the effective assistance of counsel.'" Strickland v. Washington, 466 U.S. 668, 686 (1984) (quoting McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970)). Strickland is the benchmark case for determining if counsel's assistance was so defective as to violate a criminal defendant's Sixth Amendment rights and require reversal of a conviction. Id. at 687. "When a

31

convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." Id. at 687-88. The defendant must also show that counsel's unreasonable errors or deficiencies prejudiced the defense and affected the judgment. Id. at 691. The defendant must show "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695. In sum, a defendant must satisfy the following two-prong test. Id. at 687.

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

Id.

"There is a presumption that any challenged action was sound trial strategy and that counsel rendered adequate assistance and made all significant decisions in the exercise of professional judgment." Hall v. Luebbers, 296 F.3d 685, 692 (8th Cir. 2002) (quotation omitted). It is the petitioner's burden to overcome this presumption, and a "petitioner cannot build a showing of prejudice on a series of errors, none of which would by itself meet the prejudice test." Id. Counsel's conduct must be judged by the standards for legal representation which existed at the time of the

representation, not by standards promulgated after the representation. <u>Bobby v. Van Hook</u>, 558 U.S. 4, 7-9 (2009). American Bar Association standards and similar directives to lawyers are only guides as to what reasonableness of counsel's conduct is; they are not its definitive definition. <u>Id.</u>

The Supreme Court distinguishes between those cases in which the new evidence "would barely have altered the sentencing profile presented to the sentencing judge," and those that would have had a reasonable probability of changing the result. <u>Porter v. McCollum</u>, 558 U.S. 30, 41 (2009) (quotation omitted). In assessing the prejudice prong, it is important for courts to consider "the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweigh it against the evidence in aggravation." <u>Id.</u> at 41 (internal quotation omitted, cleaned up). It is not necessary for the petitioner to show "that counsel's deficient conduct more likely than not altered the outcome" of his case, only that there is "a probability sufficient to undermine confidence in [that] outcome." <u>Id.</u> at 44 (quotations omitted). Judicial scrutiny of attorney performance is highly deferential, with a strong presumption that counsel's conduct falls within the range of reasonable professional conduct. <u>Strickland</u>, 466 U.S. at 698.

### 2.    Career Offender Enhancement

Mr. Scott argues that counsel failed to argue against the career offender enhancement. He is wrong, factually. Counsel raised this issue both in objections to the draft PSR and in objections to the final PSR at Mr. Scott's

sentencing hearing.  The court ruled against him, but counsel was not deficient in failing to raise the issue and argue in favor of Mr. Scott on the issue.  The court recommends dismissing this claim without holding an evidentiary hearing.

### 3.    Objection to Prior Felony Which Resulted in Probation

In order to qualify for the career offender classification, Mr. Scott needed two prior convictions that were either violent felonies or controlled substance felonies.  See USSG 4B1.1(a).  He argues one of his prior convictions used as a predicate for placing him in the career offender category was not a felony conviction because he received only a sentence of probation.  He asserts counsel was deficient in failing to make this argument.

Mr. Scott's PSR reveals that he had been convicted of nine (9) felony controlled substance crimes at the time of his sentencing.  CR II Docket No. 80 at pp. 10-14, ¶¶ 35-46.  Two of those convictions received sentences of probation.  Id. at p. 10, ¶¶ 35-36.  The other seven (7) felony drug convictions received sentences of incarceration.  Id. at pp. 10-14, ¶¶ 37-46.  Thus, even if Mr. Scott's assertion was correct that probationary sentences cannot be counted as prior felony controlled substance offenses under USSG § 4B1.1(a), he had more than enough prior drug felonies where he *did* receive a sentence of imprisonment to qualify him as a career offender.

In addition, Mr. Scott is wrong about the law.  A prior felony controlled substance offense counts under USSG § 4B1.1(a) even if it resulted in a sentence of probation.  See USSG § 4B1.2, cmt. 1.  Counsel was not deficient

in failing to make the argument that Mr. Scott's probationary sentences did not count as felony controlled substance convictions.  If he had made that argument, it would have been rejected as wrong under the law.  Finally, even if counsel had made the argument and the court accepted it, Mr. Scott still had sufficient other convictions to qualify as a career offender.  The court recommends this claim be dismissed without holding an evidentiary hearing.

### 4.    Miscalculation of Drug Quantity

Mr. Scott argues that counsel was ineffective for failing to object to the miscalculation of his drug quantity.  It is unclear whether Mr. Scott is arguing the amount itself was inaccurately arrived at or whether this is part of his argument that the court was not allowed to find facts which increased his sentence and counsel should have objected on that basis.  The court notes that counsel *did* object to the drug quantity contained in the draft PSR and that objection resulted in a final PSR that set forth a much lower drug quantity.

In any event, Mr. Scott is unable to carry the prejudice prong of the Strickland analysis for the same reasons discussed above.  The career offender provision, USSG § 4B1.1, determined Mr. Scott's sentence, not the drug quantity provision, USSG § 2D1.1, because the career offender provision resulted in a greater base offense level.  Thus, even if the court erred in calculating the drug quantities attributable to Mr. Scott and counsel failed to object to the calculation, he cannot show prejudice because, ultimately, those drug quantities did not inform his USSG caculation.  The court recommends dismissal of this claim without holding an evidentiary hearing.

### 5.    Disproportionate Sentence Compared to Webb

The court understands Mr. Scott to be raising both a stand-alone claim that his sentence was constitutionally disproportionate as well as a claim that counsel failed to argue his sentence was disparate as compared to Mr. Webb. The government does not address either argument.

Counsel *does* however address the issue in his affidavit. Docket No. 10 at p. 5, ¶ 12. Counsel correctly points out that he *did* raise the issue of sentencing disparity with Mr. Webb in both his motion for downward departure (CR II Docket No. 84 at p. 6) and orally at the sentencing hearing (CR II Docket No. 97 at pp. 7-9). The court finds counsel's affidavit to be entirely accurate. So counsel *did* argue that Mr. Scott's USSG range of 262 months was disproportionate to Mr. Webb's USSG range of 210 months.

As discussed above, at sentencing the court distinguished Mr. Webb from Mr. Scott by asserting that Mr. Scott committed the instant offense while on supervised release and Mr. Webb did not. While that is technically accurate ("supervised release" is a term that does not apply to Mr. Webb's situation—he was on "parole" at the time he committed the instant offense), the substance of the distinction is not accurate.

Counsel's affidavit does not address whether he considered efforts to find out whether Mr. Webb was on parole at the time he committed the instant offense. Mr. Webb had already been sentenced in September, and Mr. Scott was not sentenced until November, so Mr. Webb may have been willing to share information about his circumstances with counsel without fear that it

36

would result in a harsher sentence for himself.  Counsel did not have access to Mr. Webb's PSR to be able to know that Mr. Webb had been on parole, but his comments at Mr. Scott's sentencing hearing indicate he was at least aware of facts that might suggest Mr. Webb *had* been on parole at the time (i.e. counsel knew Mr. Webb had qualified for the career offender classification).  Because counsel's affidavit does not address whether he considered trying to find out Mr. Webb's circumstances, or whether he made efforts in that regard, the court recommends holding an evidentiary hearing on this claim of ineffective assistance of counsel as well as the related Eighth Amendment proportionality claim.

## CONCLUSION

Based on the foregoing law, facts and analysis, this magistrate judge respectfully recommends granting in part and denying in part the government's motion to dismiss [Docket No. 20].  The court recommends dismissing all of Mr. Scott's claims except the claim that his sentence violated the Eighth Amendment because it was disproportionate to Mr. Webb's sentence and that counsel was ineffective in failing to bring out facts showing Mr. Scott and Mr. Webb were similarly situated.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact.

Objections must be timely and specific in order to require de novo review by the district court.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED August 11, 2021.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge